MORAN BOLT & NUT MANUFACTURING COM-PANY, Respondent, v. MIDLAND VALLEY RAILROAD COMPANY, Appellant.

St. Louis Court of Appeals, November 13, 1906.

CONVERSION: Consignment. Where a carload of material, shipped and consigned to the purchaser, while in transit was diverted by the shipper and the billing changed so that it was consigned to the shipper in care of a company with whom the purchaser had a construction contract, and the purchaser, without paying for the material, got possession of the same with the consent of the company, an action for conversion by the shipper against the company would lie.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale*, Judge.

Bolt & Nut Mfg. Co. v. Railroad.

AFFIRMED.

*Lehmann & Lehmann* for appellant.

(1) There was no conversion. Even conceding that the evidence tends to show an intentional delivery of the car of iron in question by defendant to Kelley and an appropriation to its own use by defendant, of what was not used by Kelley. It also shows that this would not have been a violation of the rights or instructions of the plaintiff. "Conversion by necessary intendment implies a wrongful act." McDonald v. Mangold, 61 Mo. App. 291; Bank v. Metcalf, 40 Mo. App. 494; Collins v. Railroad, 94 Mo. App. 130; Bank v. Wilson, 40 Mo. App. 494; Nanson v. Jacob, 93 Mo. 340. (2) A demand for the return of the property on the part of the plaintiff and a refusal to return on the part of defendant is strong evidence and oftentimes absolutely necessary evidence in an action for conversion. Polk v. Allen, 19 Mo. 467; Mohr v. Langan, 77 Mo. App. 481; Nansen v. Jacob, 93 Mo. 331; LaFayette Co. v. Metcalf, 40 Mo. App. 494; Shaff v. Fries, 90 Mo. App. 111.

*Kinealy & Kinealy* for respondent.

Appellant was guilty of converting this carload of iron to its own use, and it is liable to plaintiff therefor. Shewalter v. Railway, 84 Mo. App. 589; Allen v. McManagle, 77 Mo. 478.

GOODE, J.— Plaintiff recovered a judgment against defendant for the value of goods alleged to have been converted by defendant. The goods were materials to be used in the construction of a railroad and consisted of bolts, washers and bridge iron. Plaintiff is an incorporated company engaged in business in St. Louis and defendant is a railroad company which, at the time of the alleged conversion, was having a railroad built

in Arkansas. The construction work had been let to another corporation known as the Cherokee Construction Company, of which F. A. Molitor was the chief engineer and as such was in charge of the construction. Molitor was also chief engineer and general manager of the defendant the Midland Valley Railroad Company. The Cherokee Construction Company had let part of the construction work to Mike Kelly, a subcontractor. Plaintiff had been selling material to Kelly prior to the shipment of the carload of material in controversy. Kelly ordered said carload of material and it was shipped to him over the St. Louis & San Francisco Railroad. While the car was in transit, or just prior to its departure, a check which Kelly had sent plaintiff for $500 on the account he owed for previous purchases of material, was protested by the bank on which it was drawn. In consequence of the check being dishonored, plaintiff diverted the car of material in controversy by directing the St. Louis & San Francisco Railroad Company to change the billing so that the car would be consigned to plaintiff itself, care of the Midland Valley Railroad Company, at Montreal, Arkansas. According to that direction the billing was changed and plaintiff became the consignee of the car at destination in care of the defendant company. In connection with this change of consignee, plaintiff wrote Molitor, general manager and chief engineer of defendant, stating the fact regarding Kelly's default, and that his payments on account had been unsatisfactory, and also stating that plaintiff had wired Kelly to have defendant company guarantee payment for the material furnished. This letter was dated February 4, 1904, the car in controversy having been shipped about that date. The car must have arrived at Montreal, Arkansas, by February 10th because, on that day, Molitor, as general manager of defendant, advised Kelly by letter that the car had arrived, billed to plaintiff, care of the defendant company, with charges of $151.33 for freight. The letter

stated to Kelly that Molitor presumed the car belonged to him and suggested that he immediately arrange to pay the freight charges, as defendant would not accept the car until the charges were paid. A copy of that letter was sent to plaintiff. On February 12th, Molitor, as general manager of defendant, wrote plaintiff that defendant was unwilling to guarantee Kelly's checks or payments, but that if he had not sufficient iron to complete his work, the contract would be taken out of his hands and plaintiff settled with accordingly. On February 15th, plaintiff wrote Molitor that plaintiff had prepaid the freight on the car (No. 13503) and had requested the St. Louis & San Francisco Railroad Company to release it to defendant, whom plaintiff would hold responsible. This letter further directed defendant, if it had no use for the material, to advise plaintiff and the car would be sent to other contractors. On the same day plaintiff wrote the St. Louis & San Francisco Railroad Company, enclosing a check for the freight on the car, and directing said company to deliver it to F. A. Molitor, as chief engineer of the Midland Valley Railroad Company. Other letters followed, in one of which Molitor, writing for defendant, said that if defendant was compelled to finish Kelly's work and needed the iron, plaintiff would be advised, but otherwise defendant would assume no responsibility. On February 22, a letter was written by plaintiff to Molitor which stated that plaintiff knew it could not hold defendant for the material, but if defendant wanted the material and would guarantee payment by Kelly, the car was available; if not, plaintiff had a customer to whom it could be diverted. On March 7th, Molitor wrote plaintiff that Kelly had failed and defendant was finishing his work, but that the carload of iron in controversy must have been released to Kelly before defendant took charge of the work, because Kelly had distributed part of the iron along the line of the railroad; that there still remained a considerable quantity of iron in the car

which Molitor had directed to be delivered to Kahmann & McMurray at Bokeshe, Indian Territory, with whom plaintiff could arrange for the use of the iron, but defendant would assume no responsibility for handling the car. This letter was answered March 9th, plaintiff stating that Kelly could not have taken the car of iron and distributed it on the line of work, as the consignee was changed several days before it reached Montreal and defendant had written plaintiff on February 10th, advising that the car was at Montreal, billed to plaintiff; that if Kelly took charge of the iron he had no authority to do so and the St. Louis & San Francisco Railroad Company had no authority to deliver it to him. On June 2d, Molitor, as general manager of defendant company, wrote plaintiff that the car in controversy had been delivered to defendant company for Kelly and part of it used in finishing Kelly's work and the rest shipped to Kahmann & McMurray; that Kelly had failed and defendant was forced to complete his work and there was not sufficient money due Kelly on his final estimate to pay for the material in controversy. Molitor undertook to procure a settlement with Kelly, by which plaintiff would realize seventy per cent of its demand. To induce the acceptance of this offer, Molitor remarked that there was no lien law in the Indian Territory where the greater part of the material was used, and that counsel had advised him that defendant was liable only for the portion of the material which was used in Arkansas. Nevertheless he said that, as plaintiff had been furnishing iron so long for bridge work done under his direction, he would not like to see it lose its entire demand. Such was the correspondence between the parties and it shows without contradiction, that the material arrived at Montreal, Arkansas, consigned to plaintiff, in care of the Midland Valley Railroad Company. What was done with it after it got there is disclosed by the testimony of Molitor. He testified that neither the Midland Valley Railroad Company nor the Cherokee

Construction Company ordered or bought the material; that Kelly bought it; that about one-half of the material was unloaded by Kelly to complete bridging along defendant's line and the remainder was shipped to the Cherokee Construction Company at Bokeshe, Indian Territory and a portion of it there turned over to Kahmann & McMurray. How Kelly got possession of the material is further explained by Molitor's testimony. He swore that as general manager and chief engineer of the defendant, he directed the disposition of the car; that he probably wrote a letter or telegram, or gave verbal directions for its disposition; that he directed that after the iron needed for Kelly's use in completing his work had been taken out, the remainder should be shipped to Bokeshe and unloaded in the Cherokee Construction Company's warehouse. Molitor further swore that the car having been consigned in the care of defendant company, Kelly could not have gotten it and taken it along his line of work without defendant's consent, though this consent need not have been formal. Molitor was asked whether, in ordering the disposition of the car, he had acted as general manager of the Midland Valley Railroad Company or as chief engineer of the Cherokee Construction Company, and answered that, without going into the private history of the connection between those two companies, it would be hard to say whether any official act of his was done as the officer of one or of the other.

On the foregoing testimony the court instructed the jury that if they found the iron in controversy was consigned to plaintiff at Montreal, Arkansas, in care of defendant, and that the St. Louis & San Francisco Railroad Company delivered the car to defendant and the latter received it, and thereafter, without any order, direction or authority from plaintiff, authorized persons other than plaintiff to receive the car and appropriate part of the iron to their own use, and that defendant appropriated the balance to its use, the jury would find the

issues in favor of plaintiff. The court further instructed that there was no evidence that plaintiff authorized defendant or any of its officers or agents to deliver the whole or part of the iron to Kelly. Defendant's requested instructions were, in substance, that if defendant used ordinary care for the protection of plaintiff's interests, it was not liable for any portion of the material taken and appropriated by Kelly or turned over to Kahmann & McMurray; that by accepting the car which had been billed to it without its knowledge or authority, defendant did not convert the car to its own use or become a purchaser, but merely brought itself under the duty to use ordinary care in looking after the car and its contents for the real owner; and that if defendant used such care, but in spite thereof the contents were appropriated by persons other than the owner, defendant was not liable for such of its contents as disappeared or were appropriated notwithstanding the exercise of ordinary care on its part; that if the jury believed plaintiff shipped the car in care of defendant with the intention of having it delivered to Kelly and defendant did deliver it to him, then the verdict should be for the defendant; that if the jury found defendant, or its agents, believed the car of iron was intended by plaintiff for Kelly and had reasonable ground for such belief, defendant did not convert the car, even though Kelly came into possession of it. The instructions requested by defendant were refused, and under those given for plaintiff the jury returned a verdict in its favor assessing its damages at $1,284.86.

This judgment was manifestly for the right party and it looks like the court might have directed a verdict in plaintiff's favor. The correspondence, in connection with Molitor's testimony, established beyond doubt that the material was consigned to plaintiff in care of the Midland Valley Railroad Company and arrived at its destination under the consignment. After its arrival Kelly appropriated part of its contents and there is

hardly room for a doubt that he did so by direct authority from Molitor, the general manager and chief engineer of the defendant company. Molitor's own testimony is that both verbally and by letter or telegram, he directed the disposition of the car. He also swore that Kelly could not have gotten the iron without defendant's consent, but said its consent need not have been formal. Defendant had no right to let Kelly have the material by either formal or informal consent, and was guilty of a conversion if it turned the material over to him or connived at his taking it. Beyond question there was evidence from which the jury might find that part of the contents was turned over by defendant or its general manager to Kelly, and such an issue was submitted to the jury. If defendant delivered part of the material to Kelly and itself appropriated part, the case does not turn on the question of its exercise of ordinary care, for there was a positive tort. The evidence is conclusive that defendant had the portion of the material which Kelly did not use, shipped to the Indian Territory and deposited in the storehouse of the Cherokee Construction Company. It matters not that part of the contents was afterwards turned over there to Kahmann & McMurray. Neither did the correspondence leave any room for the finding that plaintiff intended this material to be delivered to Kelly or that defendant had reasonable ground to believe such was plaintiff's intention; and defendant's instructions submitting those theories were properly refused. At the inception of the correspondence the car was en route, and because Kelly's check had gone to protest, the consignment was diverted so that plaintiff would be the consignee. Defendant was notified of this fact and if it subsequently permitted Kelly to take part of the property, and itself disposed of the balance without plaintiff's authority, there was a conversion.

The judgment is affirmed. All concur.